(No. 5077-

LAZAR NIKOLIC, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed July 14, 1966.*

HUGH B. ARNOLD, Attorney for Claimant.

WILLIAM G. CLARK, Attorney General; SHELDON K. RACHMAN, Assistant Attorney General, for Respondent.

DOVE, J.

Claimant, Lazar Nikolic, filed his complaint in this Court on November 30, 1962 seeking an award in the amount of $25,000.00 from the State of Illinois for personal injuries sustained by him when he was attacked by a fellow patient at the Illinois State Psychiatric Institute on November 10, 1961.

From the evidence it appears that claimant and James Watt were patients on the eighth floor of the Illinois State Psychiatric Institute, which is located at 1601 West Taylor Street in Chicago. At approximately 5:00 A.M. on November 10, 1961, Patient Watt who was returning from the bathroom in the company of a female aide ran into claimant's room, and attacked Nikolic who was sleeping. Nikolic's nose was broken. There was a cut over his nose and right eye, and he had two black eyes.

Claimant was committed to the Institute on May 23, 1961. It is not a maximum security type institution. Primarily it is a teaching and research institution, and secondarily serves the community. Patients are selected for the purpose of teaching residents in the art of psychotherapy, as well as for the benefit of the patients. It is jointly run by the State of Illinois, the five medical schools in the area, and the Michael Reese Hospital. There were eighteen patients in the ward to which claimant was committed, and each has his own room. The entrance to the ward was locked, but normally each patient's room was kept unlocked at all times. The rooms could only be locked from the outside.

James Watt was also a patient in claimant's ward. Watt was diagnosed as a disturbed man who was somewhat subdued, and had a delusion of persecution. He had homosexual fears that either people would call him a homosexual, or that people would attack him sexually. The Psychiatric Resident at the Institution testified that Watt had attacked claimant on two occasions, the first being approximately a month before the attack in November, which resulted in claimant's broken nose. On the first occasion, as on the second, claimant was sleeping. He was struck in the left eye by Watt, as a result of which he sustained a black eye, which was discolored for approximately three weeks. Following this first instance, the staff "talked the matter over with Mr. Watt." The evidence further discloses that Watt's condition was one of having delusions of being persecuted, and a paranoid personality with homosexual feelings. Following the first attack on claimant, a female aide was assigned to Watt. Her function was to supervise his activities, but not to physically control them.

The Psychiatric Resident, a medical doctor, testified that he was aware of the possibility that Mr. Watt might attack either claimant or other patients. He discussed the

matter with the staff, and more medication was prescribed for Mr. Watt to quiet his anxieties, but no recommendation was made for tighter security measures, although he was assigned an aide to take care of him, but not for the purpose of physically controlling him. During this period of time, Watt attacked two or three patients. Maximum medication was given to Watt, and he was secluded to his room for a week; then the door was unlocked during the day, and locked only at night. The doctor testified also that he could not predict that Watt would attack claimant again, but that there was a likelihood he would. Although the record contains corroborated and uncontradicted testimony of two physical assaults and battery by Watt on claimant while he was sleeping, the first resulting only in a black eye, the second resulting in two black eyes and a broken nose, and assaults on at least two other patients, still the three witnesses from the Institution did not consider Watt to be a dangerous person. They distinguished this by saying that he was a potentially dangerous person. The doctor could have recommended that Watt be transferred to a maximum security unit, but did not do so.

In the case of *Maloney* vs. *State of Illinois,* 22 C.C.R. 567, we held that the agents of the State are required to use ordinary care to protect persons and their property from being damaged by those placed under their charge.

In view of the facts that Watt was described as being "a little impulsive," was known to have destroyed property, had attacked claimant the month before, had attacked two or three other patients, and the staff knew that Mr. Watt "might attack"; and, in view of the fact that Watt passed within a few feet of Nikolic's room in going to and from the bathroom, this should have been enough of a warning to the attendant to escort him manually past claimant's door. The fact that Watt was in the company of a female aide

who probably could not have controlled him does not relieve respondent of its obligation to safeguard claimant, but only calls into question respondent's failure to transfer Watt to a different type institution in order to protect the safety of claimant and other patients.

Claimant was not guilty of contributory negligence. He was mentally ill, and could not be charged with the same degree of care for his own safety as a mentally competent person. However, there was nothing he could have done to protect himself, as he was attacked when asleep in the room assigned to him with the door open according to the rules of the hospital.

An award to claimant, Lazar Nikolic, is, therefore, made in the sum of $3000.00.